UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

MAR 2 9 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES OF AMERICA

v.

Criminal Action No. 04-446-49 (TFH)

ERMINSO CUEVAS CABRERA,
Also known as "Mincho,"

Defendant.

## MEMORANDUM OPINION

Pending before the Court is a Motion For Reconsideration Of Defendant Erminso Cuevas

Cabrera's Motion To Suppress Electronic Surveillance Evidence [Docket No. 209], which seeks

reconsideration of the Court's February 23, 2010, bench decision denying Cuevas Cabrera's

motion to suppress all electronic surveillance and wiretap evidence the government plans to

introduce at trial, as well as any evidence derived from the wiretaps. For the reasons set forth

below, the Court will deny the motion.

### BACKGROUND AND PROCEDURAL POSTURE

During a status conference held in the spring of 2009, the government reportedly

represented that it did not plan to introduce any wiretap evidence against defendant Erminso

Cuevas Cabrera. Def.'s Mot. For Reconsid. of Def. Erminso Cuevas Cabrera's Mot. to Suppress

Elec. Evidence 4 (hereinafter "Def.'s Mot. for Recons. ____"). Absent a transcript of that

hearing, however, it is unclear whether the government made that representation simply because,

at that time, it lacked any such wiretap evidence involving Cuevas Cabrera.[1] Regardless, by a

---

[1] The Court does not have transcripts of all the status conferences that took place in
2009; however, the government never refuted Cuevas Cabrera's contention that such a

letter dated August 13, 2009, the government notified Cuevas Cabrera that it was disclosing three

DVDs containing intercepted wire communications, two of which involved Cuevas Cabrera.

Gov't's Resp. in Opp'n to Def. Erminso Cuevas Cabrera's Feb. 21, 2010 Mot. to Suppress Ex. A

(Letter from Jackson, Snyder & Quinones to Slaight, Sidell, Gilbert & Hernandez (Aug. 13,

2009)). Indeed, the government's letter stated:

> [T]his letter provides additional discovery under Rule 16(a) of the Federal Rules of
> Criminal Procedure ("Fed. R. Crim. P."), and seeks reciprocal discovery.
>
> Disclosure By the Government
>
> Based on your requests, I am enclosing copies of the following documents:
>
> 1. CD-ROM titled "Tovar Wire Docs" containing previously sealed documents
> related to a wiretap including applications, orders, affidavits and ten day reports;
>
> 2. 3 DVDs labeled "Tovar Wire" containing the intercepted calls for the above
> referenced wiretap. (Of the four defendants before the Court, only defendant Erminso
> Cuevas Cabrera was intercepted on these calls. *Additionally, the Government has
> identified only two calls in which Cuevas Cabrera was intercepted: Call #1437 and
> Call #1443.* Please find hard copies of the call summaries attached) . . . .

*Id.* (emphasis added). In addition, on January 11, 2010, the government sent another letter to

Cuevas Cabrera's counsel that attached a trial exhibit list explicitly identifying the two wiretaps

involving Cuevas Cabrera as evidence the government planned to introduce at trial.[2] Gov't's

Resp. in Opp'n to Def. Erminso Cuevas Cabrera's Feb. 21, 2010 Mot. to Suppress Ex. B (Letter

from Jackson, Snyder & Quinones to Sidell & Retureta (Jan. 11, 2010)).

---

representation was made at some point during a status conference that took place in the first
quarter or so of that year, and it is the Court's recollection that the government did indicate that it
had no wiretaps involving the defendant during an early 2009 status conference.

[2] The January 11, 2010, letter identified the wiretaps involving Cuevas Cabrera as
Government's Exhibits 901 and 901-T (a)-(b). Gov't's Resp. in Opp'n to Def. Erminso Cuevas
Cabrera's Feb. 21, 2010 Mot. to Suppress Ex. B (Letter from Jackson, Snyder & Quinones to
Sidell & Retureta (Jan. 11, 2010)).

Two days before jury selection began – and about six months after initially receiving notice about the existence of the wiretaps and more than one month after receiving confirmation that the government planned to use the wiretaps at trial – Cuevas Cabrera filed a Motion To Suppress Electronic Surveillance Evidence And All Physical Evidence Derived From Such Evidence [Docket No. 201] (hereinafter cited as "Def.'s Mot. to Suppress ___"). To put the substance of the motion in perspective, 14 pages of the 25-page motion consisted exclusively of a table listing the Title III wiretap applications, affidavits and orders that Cuevas Cabrera purported to challenge. Def.'s Mot. to Suppress 3-17. It should be noted, however, that Cuevas Cabrera neglected to provide the Court with copies of any of the challenged applications, affidavits or orders, thereby precluding the Court from actually reviewing the documents to assess the potential merits of his arguments. Moreover, the remaining pages of the motion consisted primarily of what defense counsel conceded were placeholder arguments that were conclusory and served simply as an effort to preserve the legal issues for appeal. *See* Hr'g Tr. June 23, 2010. The motion lacked any actual factual analyses of the challenged applications, affidavits or orders. Indeed, there was not a single citation to a specific application, affidavit or order that Cuevas Cabrera asserted failed to comply with law.

During the pretrial hearing held on February 23, 2010, which was two days after Cuevas Cabrera filed his motion to suppress the wiretaps and one day before jury selection began, the Court entertained brief arguments about the motion. Ruling from the bench at the conclusion of the arguments, the Court denied Cuevas Cabrera's motion on the grounds that it was untimely and lacked substance. Late that same day, Cuevas Cabrera filed the pending Motion For Reconsideration Of Defendant Erminso Cuevas Cabrera's Motion To Suppress Electronic Surveillance Evidence and provided the Court with a CD-ROM containing copies of all the

applicable applications, affidavits and orders that were being challenged. Cuevas Cabrera now

contends that reconsideration of his original motion to suppress the wiretaps is warranted

because:

> [A]nalysis of the Title III applications, affidavits and orders reveals an extraordinary
> use of Title III interceptions. . . . Such a level of interception calls into question
> whether exhaustion of other investigative techniques were employed, and whether
> probable cause was satisfied. Additionally, questions have been raised about the
> integrity of the law enforcement investigation that led to the wiretaps.[3]

Def.'s Mot. for Recons. 1.

## THE WIRETAP APPLICATIONS AND INVESTIGATION

The wiretaps at issue were authorized pursuant to 18 U.S.C. § 2518 by the Honorable

Alan S. Gold, a United Stiles District Judge for the United States District Court for the Southern

District of Florida. On June 15, 2004, Judge Gold issued the first order authorizing the

interception of the wire communications challenged by Cuevas Cabrera. The affidavit that

accompanied the application for the June 15, 2004, wiretap order was attested to by a Special

Agent at the Drug Enforcement Agency ("DEA") and reveals a rather interesting investigative

strategy principally involving the use of anonymous confidential informants. To summarize the

affidavit, which the Court should note is thirty-six (36) pages long, the investigation began in

October 2002 as a covert operation to infiltrate Ferney Tovar's organization. DEA Aff. ¶ 38

(June 15, 2004). Ferney Tovar was alleged to be "a long term and high-ranking member of the

14th front of the FARC" who "ha[d] been involved in the trafficking of cocaine with the FARC

---

[3] Cuevas Cabrera's motion to suppress the electronic surveillance evidence also
challenged "whether proper statutory authorizations were obtained; and, whether minimization
procedures were properly followed." Def.'s Mot. to Suppress 1. He did not raise these two
arguments in his motion for reconsideration so it appears that he has abandoned them.

for most of his life."[4] *Id.* ¶ 31. The government planned to use reliable confidential informants to establish communications with Ferney Tovar, act as transportation brokers to move large quantities of cocaine into the United States, and provide Tovar and his key associates with four satellite telephones and technical support. *Id.* ¶ 38.

The satellite telephones the government expected the confidential informants to supply to Ferney Tovar's organization were registered and activated by the government using a fictitious name and address, and the government sought to intercept the wire communications that would occur when the satellite telephones were used by Tovar and his associates – Farouk Shaikh-Reyes, Manuel Marulanda, Diego Fernadez Aristizal, and Jose Benito Cabrera Cuevas (a/k/a "Favian Ramirez") – who were target subjects of the investigation and the wiretap application. *Id.* ¶¶ 9, 11, 18. The government gave the satellite telephones to one of the confidential informants who then provided them to Ferney Tovar's emissary, Henry Villota, for delivery to Tovar, Marulanda, Cabrera Cuevas, and Jorge Briceno-Saurez (a/k/a "Mono Jojoy"), who was believed to be the commander of the Eastern Bloc and a member of the FARC's secretariat. First Progress Report ¶¶ 2, 8.

As made clear by later applications to continue the wiretaps of the satellite telephones, the operation was a success in light of the fact that the satellite telephones were delivered to, and

---

[4] During the trial of this case, which is ongoing as of the date of this opinion, Ferney Tovar testified that he was never a member of the FARC but was trusted by Favian Ramirez and was tasked with promoting the FARC's drug trafficking policies among drug traffickers. Trial Tr. vol. 2, 46-47, March 23, 2010. This Court, however, limits its review to the facts alleged in the applications and affidavits that were before the court when it issued the orders authorizing the wiretaps. In addition, it is possible that names and aliases identified in the documents that were before the court that issued the wiretaps were later determined to be spelled differently or otherwise were more fully developed by the investigation. For ease of reference, this Court will identify names and aliases using the same spellings that were used in the wiretap applications and affidavits that are at issue.

used by, Ferney Tovar and other targeted individuals, and the government was able to intercept communications over them. *See e.g.*, Application For The Continued Interception Of Wire Communications 11-36 (Aug. 18, 2004) (summarizing intercepted communications and explaining that two of the satellite telephones were being use more extensively but that the other two satellite telephones "will reach their intended recipients located in the remote areas of the Colombian jungle within the next 30 days and will be utilized more frequently"). As a result, the government sought additional court orders authorizing it to continue intercepting communications over the satellite telephones. The applications to continue intercepting communications were filed approximately every 30 days throughout 2004 and early 2005 until the last application was filed on April 18, 2005. With each application, the number of individuals targeted increased based on the prior intercepted communications such that what started out as a request to intercept communications involving five (5) target subjects snowballed and concluded with the final application identifying approximately eighty-nine (89)[5] individuals as target subjects, including Cuevas Cabrera, who was identified as "'El Negro' a/k/a Dionisio (LNU), a/k/a 'Mincho' (previously thought to be a/k/a 'Nincho')." DEA Aff. ¶ 2 (Apr. 18, 2005).

It is against this backdrop that the Court now considers the merits of Cuevas Cabrera's motion for reconsideration.

---

[5] By the Court's calculation, there were eight-eight (88) subjects identified in the final application; because, however, Cuevas Cabrera's calculated number is different by only one name, and the ultimate number of individuals has no legal effect on the issues raised in his motion, the Court will presume that his calculation is accurate.

## ANALYSIS

### I.     Applicability of Motions for Reconsideration in Criminal Cases

As a preliminary matter, unlike the Federal Rules of Civil Procedure, the Federal Rules

of Criminal Procedure do not provide for motions for reconsideration in criminal cases.

Several of this Court's colleagues nevertheless have determined that motions for

reconsideration may be entertained in criminal cases and have adopted the same standard of

review that applies to such motions filed in civil cases pursuant to Rule 59(e) of the Federal

Rules of Civil Procedure. *See United States v. Sunia*, 643 F. Supp.2d 51, 60 (D.D.C. Aug.

11, 2009) (Judge Reggie Walton noting that members of this Court have applied the Fed. R.

Civ. P. 59(e) standard to motions for reconsideration in criminal cases); *United States v.*

*Booker*, 613 F. Supp.2d 32, 34 (D.D.C. May 7, 2009) (Judge Ricardo Urbina observing that

motions for reconsideration may be appropriate in criminal cases and applying the Fed. R.

Civ. P. 59(e) standard of review); *United States v. Ferguson*, 574 F. Supp.2d 111, 113

(D.D.C. 2008) (Judge Gladys Kessler stating that, based on dicta in *United States v. Dieter*,

429 U.S. 6 (1976), and *United States v. Healy*, 376 U.S. 75 (1964), as well as the decisions in

two federal circuit courts of appeal, "the Court will therefore proceed on the assumption that it

may consider . . . [a] motion for reconsideration" and applying the Fed. R. Civ. P. 59(e)

standard of review). Moreover, in *United States v. Pollard*, 290 F. Supp.2d 153, 157

(D.D.C. 2003), this Court entertained a motion for reconsideration in a criminal case in which

the defendant was challenging the Court's decision denying a 28 U.S.C. § 2255 motion and

the Court noted that "[a] motion to reconsider   . . . is to be treated as a '[ Fed.R.Civ.P.]

59(e) motion if filed within 10 days of entry of the challenged order and as a Rule 60(b)

motion if filed thereafter.'" *Id.* (quoting *United States v. Clark*, 984 F.2d 31, 32 (2nd

Cir.1993)). Several years after the date of the Court's decision in *Pollard*, Rule 59(e) of the Federal Rules of Civil Procedure was amended to permit a motion for reconsideration to be filed within 28 days after "the entry of the judgment." Fed. R. Civ. P. 59(e) (Rev. Dec. 1, 2009).

Accordingly, the Court will treat Cuevas Cabrera's motion for reconsideration by applying the same legal standards that apply to such motions pursuant to Fed. R. Civ. P. 59(e). "A Rule 59(e) motion 'is discretionary' and need not be granted unless the district court finds that there is an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quoting *National Trust v. Department of State*, 834 F.Supp. 453, 455 (D.D.C.1993), *aff'd in part and rev'd in part on other grounds sub nom. Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750 (D.C.Cir.1995)). As this Court previously observed, "[m]otions under Fed.R.Civ.P. 59(e) are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." *Niedermeier v. Office of Baucus*, 153 F. Supp.2d 23, 28 (D.D.C. 2001). Furthermore, "[t]he law is clear that a 'Rule 59(e) motion is not a second opportunity to present argument upon which the Court has already ruled, nor is it a means to bring before the Court theories or arguments that could have been advanced earlier.'" *Id.* (quoting *W.C. & A.N. Miller Co.'s v. United States*, 173 F.R.D. 1, 3 (D.D.C. 1997), *aff'd sub nom. Hicks v. United States*, No. 99-5010, 1999 WL 414253 (D.C. Cir. May 17, 1999)).

## II.    Cuevas Cabrera's Motion for Reconsideration

Cuevas Cabrera did not identify the basis for his request that this Court reconsider its decision denying his motion to suppress all electronic surveillance and wiretap evidence the

8

government planned to introduce at trial, as well as any evidence derived from the wiretaps. There has been no intervening change of controlling law or new evidence, so the Court is left to presume that he contends the Court's decision was clear error and/or would result in manifest injustice. The Court is disinclined to agree, however.

First and foremost, as stated previously, Cuevas Cabrera's motion to suppress the wiretaps lacked any factual analyses of the challenged wiretap applications, affidavits and orders, as demonstrated by the fact that his original motion neglected to offer so much as a single citation to a particular application, affidavit or order – much less a specific paragraph in any of those documents – that he contended supported his argument that the documents failed to comply with law. Instead, Cuevas Cabrera's motion could fairly be described as skeletal and imposed upon the Court all the effort of combing the universe of relevant documents (none of which were provided to the Court) to try to deduce whether they evidenced any possible infirmities based solely on generalized arguments about the legal standards that apply and cursory statements that the applications, affidavits and orders failed to meet the standards. As the Seventh Circuit quotably observed in a different but somewhat analogous context, "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Likewise, this Court was not obligated to hunt for evidence to substantiate Cuevas Cabrera's motion, especially when it lacked the necessary documents to do so. Furthermore, Cuevas Cabrera's attempt to use a motion for reconsideration as a means to proffer the documents and evidence his motion to suppress lacked does not warrant vacating the decision denying his motion to suppress. *See Niedermeyer*, 153 F. Supp.2d at 28 (citing *Natural Res. Def. Council, Inc. v. EPA*, 705 F. Supp. 698, 702 (D.D.C. 1989), *vacated on other grounds*, 707 F. Supp. 3 (D.D.C.1989), for

the proposition that a motion for reconsideration may not present evidence that was available but not offered in the original motion). Cuevas Cabrera's motion to suppress quite simply failed to offer any actual evidence that the wiretap applications, affidavits and orders were noncompliant and, on that basis alone, the Court stands by its conclusion that the motion properly was denied.

The Court also deemed Cuevas Cabrera's motion to suppress to be untimely. It is uncontested that, in August 2009, the government notified Cuevas Cabrera that it had two wiretap interceptions involving him. Gov't's Resp. in Opp'n to Def. Erminso Cuevas Cabrera's Feb. 21, 2010 Mot. to Suppress Ex. A (Letter from Jackson, Snyder & Quinones to Slaight, Sidell, Gilbert & Hernandez (Aug. 13, 2009)). There also is no dispute that the government confirmed its intent to use the wiretap interceptions at trial when it provided Cuevas Cabrera with advance notification about its anticipated trial exhibits on January 11, 2010. *Id.* at Ex. B (Letter from Jackson, Snyder & Quinones to Sidell & Retureta (Jan. 11, 2010)). Cuevas Cabrera did not file his motion to suppress, however, until more than a month later and only two days before jury selection began. In Cuevas Cabrera's motion for reconsideration he continues to assert that his motion to suppress was timely in light of the circumstances, but a motion for reconsideration is not an opportunity to simply re-litigate an issue. *See Jung v. Assoc. of Am. Med. Colleges*, 226 F.R.D. 7, 8 (D.D.C. 2005) (stating that a motion for reconsideration should "not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment").

## II.     The Wiretap Applications, Affidavits and Orders

Notwithstanding the Court's determination that it properly denied Cuevas Cabrera's motion to suppress for lack of factual support and untimeliness, the Court nevertheless

reviewed all the applicable documents to fully assess the legal merit of his claims that the

wiretap applications, affidavits and orders fail to comply with law. After this careful review,

the Court concludes otherwise.

As this Court previously observed in *United States v. Glover*, 583 F. Supp.2d 21, 25-

26 (D.D.C. 2008), the legal standards that govern an application for a court order authorizing

the interception of wire, oral, or electronic communications are defined by statute:

> Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.
> § 2510 *et seq.*, authorizes the district court to approve an application for the
> interception of certain wire, oral, or electronic communications. 18 U.S.C. § 2518.
> The wiretap statute requires that an application for a wiretap shall be in writing,
> under oath, and shall contain certain information including "a full and complete
> statement of the facts and circumstances relied upon by the applicant[ ] to justify
> his belief that an order should be issued." *Id.* § 2518(1). On the basis of the facts
> submitted by the applicant, the district court may authorize a wiretap upon finding
> that (1) probable cause exists to believe that an individual has committed or is
> about to commit one of certain enumerated offenses; (2) probable cause exists to
> believe that "particular communications concerning that offense will be obtained"
> through an interception; (3) "normal investigative procedures have been tried and
> have failed or reasonably appear to be unlikely to succeed if tried"; and (4)
> probable cause exists to believe that the communication facility sought to be
> wiretapped "[is] being used, or [is] about to be used, in connection with the
> commission of [the] offense." *Id.* § 2518(3)(a-d); see *United States v. Donovan*,
> 429 U.S. 413, 435, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The determination that
> "normal investigative procedures have been tried and have failed or reasonably
> appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. §
> 2518(3)(c), is referred to as the "necessity requirement," and it is the "keystone
> of congressional regulation of electronic eavesdropping." *United States v.*
> *Williams*, 580 F.2d 578, 587-588 (D.C.Cir.1978).

> The wiretapping statute also requires that "[e]very [wiretap] order and extension
> thereof shall contain a provision that the authorization to intercept shall be executed
> as soon as practicable [and] shall be conducted in such a way as to minimize the
> interception of communications not otherwise subject to interception ...." 18
> U.S.C. § 2518(5). This is referred to as the "minimization requirement." Although
> "[t]he statute does not forbid the interception of all nonrelevant conversations," the
> government must make reasonable efforts to "minimize" the interception of such
> conversations. *Scott v. United States* , 436 U.S. 128, 139-40, 98 S.Ct. 1717, 56
> L.Ed.2d 168 (1978). The statute also provides that an order authorizing an
> interception cannot extend "for any period longer than is necessary to achieve the
> objective of the authorization, nor in any event longer than thirty days." 18 U.S.C.

11

§ 2518(5).

> The wiretap statute provides that "no part of the contents of [intercepted] communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding . . . if the disclosure of that information would be in violation of this chapter." *Id.* § 2515. The "aggrieved person" may move to suppress the introduction of wiretap evidence or its fruits if "the communication was unlawfully intercepted," the "order of authorization or approval under which it was intercepted is insufficient on its face," or if "the interception was not made in conformity with the order of authorization or approval." *Id.* § 2518(10)(a)(i-iii); *see Donovan*, 429 U.S. at 433-34, 97 S.Ct. 658.

*United States v. Carter*, 449 F.3d 1287, 1292-93 (D.C. Cir. 2006). Cuevas Cabrera's motion

for reconsideration contends that the wiretap applications, affidavits and orders fail to comply

with the statutory and legal precedent because the scope of the authorizations "calls into

question" whether other investigative techniques were exhausted and whether probable cause was

demonstrated. Def.'s Mot. for Recons. at 1. In addition, Cuevas Cabrera asserts that an internal

DEA memorandum alleging corruption among agents implicates the veracity of the affidavits

submitted in support of the wiretap applications in this case. *Id.*

A.    Whether the applications and affidavits demonstrate probable cause

When considering whether a wiretap application demonstrates probable cause, courts

apply the same standards that apply to search warrants. *See United States v. Diaz*, 176 F.3d

52, 110 (2d Cir. 1999) ("The standard for probable cause applicable to § 2518 is "the same as

the standard for a regular search warrant."); *United States v. Fairchild*, 189 F.3d 769, 775

(8th Cir. 1999) ("We evaluate probable cause for the issuance of a wiretap under the same

standard that we use to evaluate probable cause for the issuance of a search warrant."); *United

States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990) (stating that "[w]e review the

district court's finding of probable cause for a wiretap under the same standard used for a

search warrant"); *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) ("An application

for a wiretap authorization must be supported by the same probable cause necessary for a search warrant."). A federal judge evaluating a wiretap application to determine whether it demonstrates probable cause must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that . . . evidence of a crime" will be obtained by the interception of wire, oral, or electronic communications. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "The [] affidavit must be read and interpreted in a commonsense and realistic fashion. If the apparent facts set out were such that a reasonably discreet and prudent man would be led to believe that [the target] was using the telephone [] in buying and selling narcotics and in conspiring to do so, that was enough [to establish probable cause to intercept communications]." *United States v. James*, 494 F.2d 1007, 1015 (D.C. Cir. 1974).

"While each fact standing alone may be insufficient, the combination of all the facts can establish probable cause . . . and certain conduct that may appear 'innocent to a lay person may have entirely different significance to an experienced [law enforcement] officer.'" *United States v. Gilliam*, 167 F.3d 628, 633 (D.C. Cir. 1999) (quoting *United States v. Catlett*, 97 F.3d 565, 573-74 (D.C. Cir. 1996)). On more than one occasion the United States Supreme Court has emphasized that the determination of probable cause cannot be made by viewing relevant facts in isolation. *See*, *e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 372 n.2 (2003) (noting that a court was "mistaken" in its approach of considering a fact "in isolation, rather than as a factor in the totality of the circumstances"); *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (per curiam) (finding that a state supreme court erred by "judging bits and pieces of information in isolation" and thereby failing to consider a law enforcement officer's

affidavit in its entirety). Instead, the court considers the totality of the circumstances to determine whether probable cause has been demonstrated. *See, e.g., United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005) ("Probable cause is synonymous with "fair probability," and it is an objective standard requiring an analysis of the totality of the circumstances . . . ." (internal citation omitted)). It also is the duty of a reviewing court "to ensure that the [judge issuing the wiretap order] had a substantial basis for . . . conclud[ing] that probable cause existed." *Gates*, 462 U.S. at 238-39 (internal quotation marks omitted).

The defendant argues that "[i]n Mr. Cuevas' case, there is a failure to explain how probable cause explodes from five targets to eighty-nine targets. . . . Deficiencies also exist since the requests for extensions of surveillance cannot serve as probable cause to support extensions of previously unlawful interceptions." Def.'s Mot. to Recons. 22. The defendant further asserts that "the government was 'piggy-backing' the applications and affidavits" as "exemplified by the 'cut-and-paste' done by agents as they drafted the applications and affidavits." *Id.* at 22-23. According to the defendant:

> The "cutting and pasting" is especially serious in light of Mr. Cuevas' limited appearance in the intercepts. Each application failed to support the need for further surveillance given that no investigation was specifically targeted at Mr. Cuevas. Failure to delineate new events to support probable cause is "insufficient without a showing of present probable cause for the continuance of the eavesdrop." It is difficult to see how continued surveillance can stand when review of the affidavits reflects that paragraph after paragraph was merely lifted and dropped into a new affidavit, a new defendant, or a new version of surveillance.

*Id.* at 23 (internal citations omitted).

Addressing first Cuevas Cabrera's query about how probable cause "explodes" from five (5) targets to eight-nine (89) targets, the very nature of this complex investigation answers the question. As the applications and affidavits make clear, the DEA was working with three confidential informants, one of whom had a long-standing relationship with Ferney Tovar,

another was an associate of the first informant, and the third was a "Colombian drug trafficker for over twenty years [who] knows FARC drug trafficker Jose Benito Cabrera Cuevas" and who was "considered to be one of the DEA's most important sources of information in Colombia." DEA Aff. ¶¶ 25-27 (June 15, 2004). The DEA determined, via information from these confidential informants and other sources, that Ferney Tovar was a high-ranking member of the FARC who was involved in the FARC's cocaine trafficking. *Id.* ¶¶ 31, 39, 42, 43, 44, 46, 56, 57, 58.

To infiltrate Ferney Tovar's organization and determine the organization's members, the DEA planned to provide Tovar and his associates with satellite telephones the DEA anticipated would be used in Colombia to conduct cocaine-trafficking communications. *Id.* ¶¶ 10, 11, 18, 19, 21, 38, 60. The confidential informants assisted the DEA by arranging to supply the DEA's satellite telephones to Ferney Tovar and his associates through intermediaries. *Id.* ¶¶ 40, 43, 44, 55, 57, 58, 59. The satellite telephones were delivered by one of the confidential informants to Ferney Tovar's emissary, Henry Villota. DEA Aff. ¶ 61 (July 20, 2004). As subsequent wiretap applications and affidavits indicated, it took time for the satellite telephones to be transported into Colombia's jungles and to the targets. *Id.* ¶¶ 66-68, 76; DEA Aff. ¶ 57 (Aug. 18, 2004). Furthermore, it appears that "Tovar and his associates have a pattern of changing phones and will not use one target telephone for several days or months and then will begin to use that phone again."[6] DEA Aff. ¶ 42 (Dec. 17, 2004) (formatting omitted).

Once the satellite telephones were in Ferney Tovar's and the FARC's hands,

---

[6] This might explain the overall duration of the surveillance, which Cuevas Cabrera complained "is historically significant in this circuit." Def.'s Mot. for Recons. at 4.

communications were intercepted that further revealed the identities of other individuals involved in Ferney Tovar's organization. It appears that when new individuals participated in communications that were intercepted via the court-ordered wiretap interceptions, and the conversations related to cocaine trafficking, the names of those individuals would be added as subjects to the next application and affidavit to continue the wiretap interceptions. *See, e.g.*, DEA Aff. ¶¶ 10-20, 23-47 (Sept. 17, 2004). Given that, as the first affidavit explained, the FARC consists of "anywhere between 15,000 to 20,000 armed guerilla soldiers," DEA Aff. ¶ 30 (June 15, 2004), it frankly is not surprising that an investigation of its cocaine-trafficking activities might reveal that eighty-nine (89) people or more were involved in the effort.

As far as Cuevas Cabrera's appearance in the investigation, he asserts that the wiretap applications at issue here do not identify him as a target until the sixth request for an extension, which was filed on December 17, 2004. Def.'s Mot. for Recons. at 2. In any case, the December 17, 2004, wiretap application and accompanying affidavit contain an extensive description of the investigation into Ferney Tovar's narcotics operation, the use of the satellite telephones, and the intercepted communications between Tovar or his associates and Cuevas Cabrera, who was identified by alias as "El Negro," "Dionisio" or "Nincho," as well as conversations during which targeted subjects referred to Cuevas Cabrera by one of the identified aliases. DEA Aff. 26-28, 31, 39-40 (Dec. 17, 2004). For example, the first intercepted call involving Cuevas Cabrera was made by Ferney Tovar and allegedly involved Ferney Tovar speaking directly to Cuevas Cabrera about a possible drug transaction. *Id.* ¶ 32. Likewise, the second intercepted call involving Cuevas Cabrera was similar in that it also allegedly involved a direct conversation between Ferney Tovar and Cuevas Cabrera about a possible drug transaction. *Id.*

The Court concludes that, given all the circumstances set forth in the December 17, 2004, affidavit, which incorporated by reference the original affidavit, *see id.* at 13 (stating that the original affidavit is submitted as an attachment and "incorporated in full herein by reference as a basis for the application for this order"), there was a fair probability not only that evidence of a crime would be obtained by the interception of the communications taking place over the satellite telephones that were the subject of the wiretap application, but also more specifically that Cuevas Cabrera would communicate on the target satellite telephones about the target offenses.[7] The Court further concludes that Cuevas Cabrera's complaint that the wiretap applications and affidavits involved extensive "cutting and pasting" is not supported by the applicable documents. To the contrary, the December 17, 2004, affidavit described in detail the relevant intercepted communications that involved the individuals that were being targeted as new subjects for that wiretap application, summarized their background, and otherwise addressed results of the investigation that were not covered by prior applications and affidavits. DEA Aff. ¶¶ 4, 5, 8, 10-22, 23, 25-43, 44 (Dec. 17, 2004). The subsequent affidavits that listed Cuevas Cabrera as a target were similarly particular. *See* DEA Aff. (Jan. 13, 2005); DEA Aff. (Feb. 12, 2005); DEA Aff. (Mar. 14, 2005); DEA Aff. (Apr. 18, 2005).

For the foregoing reasons, this Court finds that Judge Gold had a substantial basis to conclude that probable cause existed when he authorized the wiretaps at issue in this case.

---

[7] The target offenses included drug trafficking, money laundering, and aiding and abetting those offenses. DEA Aff. ¶ 4 (Dec. 17, 2004).

B.     Whether the applications and affidavits demonstrate the necessity for wiretaps

The necessity requirement in 18 U.S.C. § 2518 mandates that a wiretap application

include "a full and complete statement as to whether or not other investigative procedures have

been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be

too dangerous . . . ." 18 U.S.C. § 2518(1)(c). As the D.C. Circuit has explained:

> Congress created the necessity requirement to ensure that "wiretapping is not
> resorted to in situations where traditional investigative techniques would suffice to
> expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977,
> 39 L.Ed.2d 225 (1974). To adhere to Congress's purpose, a court will "give close
> scrutiny" to a contested wiretap application and will "reject generalized and
> conclusory statements that other investigative procedures would prove
> unsuccessful." *Williams*, 580 F.2d at 588. Because, however, the "statutory
> command was not designed to foreclose electronic surveillance until every other
> imaginable method of investigation has been unsuccessfully attempted," the
> government will meet its burden of demonstrating necessity if it shows that "other
> techniques are impractical under the circumstances and that it would be
> unreasonable to require pursuit of those avenues of investigation." *Id.* (internal
> quotation marks omitted).

*United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006). In addition, "Circuit

precedent clarifies that 'a court may authorize the wiretap of the phone of a member of an

operation if traditional investigative techniques have proved inadequate to reveal the

operation's full 'nature and scope.'" *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir.

1989) (quoting *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987)).

In both *Carter* and *Sobamowo*, the two cases cited *supra*, the D.C. Circuit rejected the

defendants' contentions that it was improper for the government to rely on material about the

investigation derived from affidavits supporting the wiretaps of other targets of a narcotics

operation and to fail to investigate the defendants by first using non-wiretap investigative

methods. *Carter*, 449 F.3d at 1293; *Sobamowo*, 892 F.2d at 93. In both cases, the D.C.

Circuit concluded that the affidavits met the necessity requirement by describing specific

evidence establishing that a drug trafficking operation existed, the defendants were involved in the operation, and the government tried to gather information about the defendants in other ways. *Carter*, 449 F.3d at 124; *Sobamowo*, 892 F.2d at 93. This case is similar in that the affidavits at issue also describe specific evidence establishing that a drug trafficking operation existed, Cuevas Cabrera was involved in that operation, and the DEA tried to gather information in other ways but other investigative techniques were impractical under the circumstances, so it was unreasonable to require pursuit of them. *See* DEA Aff. ¶¶ 30-60, 63-65 (June 15, 2004); DEA Aff. ¶¶ 8, 20, 24, 25-42, 43, 45-50 (Dec. 17, 2004). Again, this was a complex case involving an international cocaine-trafficking conspiracy by a large, secretive, and organized guerilla organization in Colombia that is entrenched in mountainous and jungle terrain. Common sense dictates that many, if not most, traditional investigative techniques were foreclosed by these circumstances and the DEA affidavit sufficiently justified the impracticality of attempting traditional techniques. DEA Aff. ¶¶ 63-65 (June 15, 2004); DEA Aff. ¶¶ 45-50 (Dec. 17, 2004); DEA Aff. ¶¶ 39-41 (Jan. 13, 2005); DEA Aff. ¶¶ 36-38 (Feb. 12, 2005); DEA Aff. ¶¶ 41-43 (Mar. 14, 2005); DEA Aff. ¶¶ 34-36 (Apr. 18, 2005).

C.    The veracity of the affidavits

The standards that govern a defendant's challenge to the veracity of an affidavit used to secure a warrant or wiretap order are set forth in the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of

witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

438 U.S. at 171-72. Likewise, under certain circumstances an evidentiary hearing and

suppression are an appropriate remedy if the affidavit contains "material omissions" that

would defeat probable cause. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. July

11, 2008) (pet. for cert. filed).

Cuevas Cabrera challenges the veracity of the relevant wiretap applications and

affidavits on the ground that a December 19, 2004, internal memorandum from a United States

Department of Justice Trial Attorney to the Chiefs of the Narcotics and Dangerous Drugs

Section highlights corruption within the DEA and, in particular, DEA agents in Bogota,

Colombia. Def.'s Mot. for Recons. 6. While the allegations contained in the memorandum

certainly are troubling, there is no indication that the DEA agent who prepared the affidavits at

issue here was in any way involved in or implicated by the events described in the

memorandum. Significantly, Cuevas Cabrera offers no evidence that the allegations the

memorandum were ever corroborated or resulted in an investigation or proceeding that

confirmed the truth of them. As the Supreme Court stated, to warrant an evidentiary hearing,

Cuevas Cabrera must allege that the affidavits at issue contain deliberate falsehoods or

demonstrate a reckless disregard for the truth and such allegations must point out the specific

portion of the affidavit that is false and be accompanied by a statement of supporting reasons.

*Franks*, 438 U.S. at 171. Cuevas Cabrera did not identify a single statement in the challenged

20

affidavits that he claims is false and, as a consequence, his argument is wholly conclusory. There is no indication that the applications and affidavits involved in this case lacked veracity so no evidentiary hearing was warranted.

Thus, even if the Court found Cuevas Cabrera's motion to suppress the wiretaps to be timely and adequately supported, it nevertheless would have denied the motion on its merits for the reasons discussed.

## CONCLUSION

For the reasons set forth above, the Court will deny the Motion For Reconsideration Of Defendant Erminso Cuevas Cabrera's Motion To Suppress Electronic Surveillance Evidence [Docket No. 209]. An appropriate order will accompany this Memorandum Opinion.

March 29, 2010

Thomas F. Hogan
United States District Judge