# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ERMINSO CUEVAS CABRERA,**<br>**Also known as "Mincho,"**<br><br>**Defendant.** | **Criminal Action No. 04-446-49 (TFH)** |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is defendant Erminso Cuevas Cabrera's Motion For A

Judgment Of Acquittal, Or, In The Alternative, Motion For New Trial And Motion To Dismiss

[Docket No. 270]. The defendant contends that he is entitled to a judgment of acquittal pursuant

to Rule 29 of the Federal Rules of Criminal Procedure on the grounds that the evidence proved at

trial impermissibly varied from the allegations in the indictment by establishing multiple

conspiracies rather than a single conspiracy, he was prejudiced by being joined with his co-

defendant at trial, and the government failed to present sufficient evidence to sustain his

conviction. In addition, the defendant asserts that he is entitled to a new trial pursuant to Rule 33

of the Federal Rules of Criminal Procedure because the prosecutor made improper remarks

during closing arguments, the Court improperly denied his trial motions to sever and for a

mistrial, the Court improperly denied is pre-trial motions to sever, and his conviction was not

supported by the weight of the evidence. For the reasons set forth below, the Court will deny the

motions.

# I. BACKGROUND

On March 1, 2006, Erminso Cuevas Cabrera, who is also known as "Mincho," was indicted with 50 other individuals and charged with unlawfully, intentionally, and knowingly combining, conspiring, confederating and agreeing with others known and unknown to violate the narcotics laws of the United States. (Indictment ¶ 1.) The objects of the alleged narcotics conspiracy were (1) to import into the United States five kilograms and more of mixtures and substances containing detectable amounts of cocaine and (2) to manufacture and distribute five kilograms and more of mixtures, compounds and substances containing detectable amounts of cocaine, and coca leaves, intending and knowing that these controlled substances would be unlawfully imported into the United States. (Indictment ¶ 2.) To summarize, the indictment specifically alleged the following:

The means and methods of the conspiracy entailed a structured and organized cocaine manufacturing, production, supply and distribution system controlled by the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), which was described as a left-wing guerilla organization that "has evolved into the world's largest supplier of cocaine and cocaine paste." (Indictment ¶ 7.) The FARC is hierarchically organized and structured, with policies set by the Secretariat, which consists of "the top seven leaders who are the ultimate decision makers of the FARC," and the Estado Mayor, which is subordinate to the Secretariat but consists of the members of the Secretariat plus 20 or so other members who are "Bloc Commanders, senior Front Commanders, and other individuals who have attained leadership positions within the FARC." (Indictment ¶¶ 10-11.) The geographical areas of Colombia over which the FARC exercises dominion are divided into Blocs or Joint Commands, which are further subdivided into numbered "Fronts" or "Mobile Columns." (Indictment ¶¶ 12, 15.) A Front

is "primarily responsible for all activities in the geographic area [that] it controls, including all activities relating to cocaine and cocaine paste manufacturing and distribution." (Indictment ¶ 12.) These Fronts and Mobile Columns are led by Front Commanders with the assistance of Finance Officers who manage the Front's financial interests, "including matters concerning narcotics manufacturing and distribution." (Indictment ¶¶ 12-13.)

According to the allegations in the indictment, the FARC relies on income from cocaine trafficking to fund the organization's activities and procure weapons. (Indictment ¶¶ 14, 25, 27, 30, 31.) Because the FARC governs large geographic regions of Colombia where coca growing and cocaine processing is prolific, over time it has exerted authoritarian control and dominance over cocaine production and distribution in those regions and established distribution networks to increase its revenues and facilitate cocaine's importation into the United States. (Indictment ¶¶ 7-8, 12, 17-34.) The indictment alleges that the FARC accomplishes this by establishing strict policies that govern cocaine production and distribution and severely enforcing those policies, monopolizing the pricing and purchase of coca paste from farmers who grow coca and convert it to cocaine paste, taxing all aspects of the cocaine trade, running the laboratories that process cocaine paste into manufactured powder cocaine or taxing independent laboratories that do so, setting the price at which cocaine is sold, building and operating clandestine air strips to transport cocaine, and establishing distribution networks to import cocaine into the United States. (Indictment ¶¶ 4, 11, 12, 18-29.) The FARC's individual Fronts are responsible for financing themselves by managing the cocaine trade and revenues for the region the Front oversees and then redistributing revenues and resources throughout the FARC "to support other Fronts that generate[] smaller revenues from the manufacture and distribution of cocaine paste and cocaine" and "for the enrichment of the

--3--

Secretariat, Estado Mayor and Bloc commanders, and in order to purchase weapons and supplies for all members of the FARC." (Indictment ¶ 30.) The Fronts are aided in this endeavor by associates "who work with the Fronts in the narcotics trade and who assist in the manufacturing of cocaine and the exchange of cocaine for weapons." (Indictment ¶ 14.)

The indictment goes on to allege that the defendant was a FARC associate "who managed cocaine laboratories for the FARC's 14th Front, oversaw the production and distribution of hundreds of thousands of kilograms of cocaine" and who "converted as much as 2.5 tons of cocaine paste into cocaine approximately several times a month." (Indictment ¶¶ 35(d), 35(d)(iii)). In addition, the defendant allegedly operated a cocaine laboratory that was equipped by the FARC, received ton quantities of cocaine paste from the 14th Front's Finance Officer, converted ton quantities of cocaine paste in his laboratories and provided the finished cocaine to drug transportation organizations identified by his brother, Jose Benito Cabrera Cuevas, also known as "Fabian Ramirez," who was a member of the Estado Mayor, regularly sent billions of Colombian pesos to the 14th Front's Finance Officer to pay for cocaine paste, and supplied ton quantities of FARC cocaine to an unindicted co-conspirator who transported the cocaine from the defendant's laboratory. (Indictment ¶¶ 35(d)(i)-(vi).)

On September 20, 2007, the defendant was extradited from Colombia to the United States to stand trial for the charged crimes. After the subsequent extradition and arraignment of three co-defendants, as well as protracted pretrial proceedings in this complex international criminal case, the trial of the defendant and co-defendant Juan Jose Martinez Vega began on February 24, 2010. Because the defendant's pending motions challenge the sufficiency of the evidence at trial, in addition to other issues, a summary of the trial evidence is warranted.

The evidence at trial[1] established that Colombia became a leader in cocaine production in the 1990s, with production from the late 1990s into the early 2000s increasing from about 25% to 60% of the world's coca. (Trial Tr. PM Session 21-22, Feb. 24, 2010.) Colombia produces between 500 and 600 metric tons of cocaine annually and is the "number-one coca cultivator as well as the number-one producer of cocaine." (Trial Tr. PM Session 24, 30, 40, Feb. 24, 2010.) The United States is the world's largest cocaine consumer and approximately 90% of the cocaine consumed in the United States comes from Colombia. (Trial Tr. PM Session 31, 42, Feb. 24, 2010.) The United States also is the predominant destination for cocaine leaving Venezuela, which borders Colombia and through which cocaine is smuggled from Colombia. (Trial Tr. P.M. Session 45-46, 62, Feb. 24, 2010 .)

Cocaine imported from Colombia arrives in the United States as a powder that is formed into a kilogram-sized brick that is worth, on average, about $2,000 per kilogram when ready for export in Colombia and about $30,000 in the United States. (Trial Tr. PM Session 24, 31, Feb. 24, 2010.) Colombian cocaine typically has been imported into the United States via a secondary country because of transportation limitations and because narcotics traffickers tend to seek areas of "weak law enforcement," with "porous borders" that create a "path of least resistance" when compared to direct shipment to the United States. (Trial Tr. PM Session 24, 27, Feb. 24, 2010.) About 90% of the cocaine imported from Colombia into the United States travels through Central America and Mexico, with the remaining 10% traveling

---

[1] The Court cautions that this summary of the trial evidence is by no means exhaustive and, instead, is primarily an abstract of the witness testimony. In addition, both Erminso Cuevas Cabrera and Juan Jose Martinez Vega filed post-trial motions seeking judgments of acquittal or a new trial so, to the extent that trial evidence related to both defendants, that evidence is summarized identically in this opinion and the opinion addressing Martinez Vega's motions.

--5--

through Caribbean countries. (Trial Tr. PM Session 25, 27, 29, Feb. 24, 2010.) Because it is more profitable to sell cocaine in the United States versus Mexico, and the demand is greater, the vast majority of cocaine transported to Mexico from Colombia ultimately is imported into the United States. (Trial Tr. Feb. 24, 2010 P.M. Session 36.) Virtually every mode of transportation is used to transport cocaine from Colombia to the United States. (Trial Tr. P.M. Session 32-35, 50-53, Feb. 24, 2010.)

The trial evidence also established that the Fuerzas Armadas Revolucionarias de Colombia ("FARC") – a Marxist organization present almost everywhere in Colombia but particularly in rural regions of the country – initially interjected itself into the cocaine trade by extorting money from the farmers who grew coca and produced cocaine paste, as well as the drug traffickers and operators of cocaine processing laboratories, each of whom had to pay a tax to the FARC for the coca fields or for each kilogram of cocaine produced. (Trial Tr. PM Session, 37-38, Feb. 24, 2010; Trial Tr. AM Session 21-22, Feb. 25, 2010; Trial Tr. PM Session 45, Mar. 2, 2010; Trial Tr. AM Session 62, Mar. 4, 2010.) In the 1990s, the FARC began to purchase cocaine base itself and later set the price it was willing to pay. (Trial Tr. AM Session 32, Mar. 2, 2010; Trial Tr. PM Session 63, Mar. 4, 2010.) As the FARC began to appreciate the revenues generated by the cocaine trade and learned how to process cocaine, it expanded its involvement to become a cocaine supplier, an operator of cocaine laboratories, and to otherwise engage in typical cocaine trafficking activities that previously were the domain of major cartels like the Medellin and Cali cartels. (Trial Tr. PM Session 38, Feb. 24, 2010; Trial Tr. AM Session 30-31, Mar. 2, 2010; Trial Tr. AM Session 64-65, Mar. 4, 2010.)

The trial evidence also established that the FARC is a hierarchical organization governed by a Secretariat and the Estado Mayor. (Trial Tr. AM Session 24-25, Feb. 25, 2010; Trial Tr. PM Session 42-44, Feb. 25, 2010.) The FARC is divided into seven Blocs, which are designated geographically, with the Eastern and Southern Blocs being the most significant in terms of the production of illegal coca crops.[2] (Trial Tr. AM Session 27, 33, Feb. 25, 2010.) Most Colombian cocaine is produced in the eastern or southern regions of the country. (Trial Tr. PM Session 34, 37, Feb. 24, 2010.) The Blocs are further divided into Fronts, which are the military units in each Colombian department. (Trial Tr. AM Session 24-25, 27, Feb. 25, 2010.) The FARC also consists of Mobile Columns that engage in military actions against the Colombian government and Urban Fronts that operate in cities. (Trial Tr. Feb. 25, 2010 A.M. Session 25-26.)

Within a Front there is a Finance Officer who is responsible for managing drug trafficking and the Front's money by collecting the cocaine taxes, resources, and coca base to deliver to FARC superiors. (Trial Tr. AM Session 25, 28, Mar. 2, 2010; Trial Tr. AM Session, 60, Mar. 4, 2010.) The Finance Officer buys or collects cocaine base from the farms where coca is cultivated and cocaine paste manufactured, weighs the cocaine base, and then pays the farmer if the farm was independently owned or simply collects it from the farms operated by the FARC. (Trial Tr. AM Session 28-29, Mar. 2, 2010.) The FARC sets the price for cocaine base and then buys it at that price from farmers. (Trial Tr. AM Session 32, Mar. 2, 2010.)

---

[2] The other Blocs consist of the Caribbean, Magdalena, and José Maria Cordova Blocs, plus the Eastern Joint Command and the Central Joint Command. (Trial Tr. AM Session 27, 30-31, Feb. 25, 2010.)

The FARC reached a pinnacle with respect to its expansion and the size of its membership during the relevant period of the conspiracy charged in the indictment, namely 1998 to 2004, which also coincided with the designation of a demilitarized zone ("DMZ") for peace talks from 1998 to 2002. (Trial Tr. AM Session 31-32, Feb. 25, 2010; Trial Tr. AM Session 28, Mar. 1, 2010.) All the FARC Fronts were active in the DMZ. (Trial Tr. AM Session 28, Mar. 1, 2010.) During that time the FARC's membership peaked at about 16,000 people. (Trial Tr. AM Session 21, Feb. 25, 2010.) The FARC's warfare ammunition, training, and food for personnel was funded by narcotics trafficking. (Trial Tr. AM Session 38, Mar. 1, 2010.)

The defendant's brother, Jose Benito Cabrera Cuevas, also known as "Fabian Ramirez," was the commander of the FARC's Southern Bloc. (Trial Tr. Feb. 25, 2010 A.M. Session 32.) The Southern Bloc included the 14th Front. (Trial Tr. AM Session 60, Feb. 25, 2010; Trial Tr. PM Session 8, Feb. 25, 2010; Trial Tr. PM Session 6, Mar. 10, 2010.)

Colonel Javier Mauricio Alvarez Ochoa from the Colombian National Police testified as an expert about the production of cocaine base and cocaine hydrochloride and the history and organization of the FARC. (Trial Tr. AM Session 20, Feb. 25, 2010.) Colonel Alvarez explained the equipment needed to construct a cocaine base laboratory and the process to manufacture cocaine base as well as the process to manufacture cocaine hydrochloride and the higher costs involved in equipping a cocaine hydrochloride laboratory as compared to cocaine base laboratories. (Trial Tr. AM Session 42-57, Feb. 25, 2010.) He also testified that he conducted anti-narcotic operations in the 14th Front and, during those operations, discovered coca crops, cocaine laboratories, illegal airstrips and cocaine complexes. (Trial Tr. AM Session 59-62, Feb. 25, 2010; Trial Tr. PM Session 9, Feb. 25, 2010.) In addition, during an

--8--

operation in the demilitarized zone in 2002, the Colombian National Police raided a FARC cocaine laboratory that contained approximately seven tons of cocaine base and seven tons of cocaine hydrochloride. (Trial Tr. PM Session 15-17, Feb. 25, 2010.)

Witness Maria Santiago testified that one of her brothers, who was a member of the FARC, introduced her to the defendant after she said she would be willing to work at the defendant's cocaine laboratory, which processed powder cocaine. (Trial Tr. AM Session 43-45, Mar. 1, 2010.) Maria Santiago said the defendant told her that she would be cooking meals for the people working at his laboratory. (Trial Tr. AM Session 45, Mar. 1, 2010.) The defendant told Maria Santiago that she was not allowed to have any relationships with the workers at the laboratory or to go to the town for six months. (Trial Tr. AM Session 46, Mar. 1, 2010.) Maria Santiago testified that workers at the cocaine laboratory said the laboratory belonged to the defendant and his brother, Fabian Ramirez. (Trial Tr. AM Session 59, Mar. 1, 2010; Trial Tr. PM Session 57-58, Mar. 1, 2010 (confirming that she consistently told United States agents and prosecutors that the defendant was the "boss" of the laboratory).) She also said that one of the defendant's other brothers, Mr. Casicura, would manage the cocaine laboratory when the defendant was away. (Trial Tr. AM Session 47-48, 50, Mar. 1, 2010.)

Maria Santiago identified the defendant and said she worked at his cocaine laboratory for about three months and never left during that time. (Trial Tr. AM Session 42, 60, Mar. 1, 2010.) She described the laboratory, which she said was big, and her responsibilities as the cook preparing food for approximately 80 laboratory workers. (Trial Tr. AM Session 51-54, Mar. 1, 2010.) She also described the cocaine process that she witnessed while working at the defendant's laboratory and said that cocaine would come into the laboratory anywhere from

--9--

two or three times per week to three or four times a month. (Trial Tr. AM Session 54, Mar. 1, 2010.) Maria Santiago testified that the defendant would arrive at the laboratory by speed boat with other men, would meet with Mr. Casicura and others in a room, always carried a pistol with him, and would be present at the laboratory when a lot of work was being done, such as when 2,000 to 5,000 kilograms of cocaine arrived to be processed. (Trial Tr. AM Session 55-56, 58, 59, Mar. 1, 2010.) She said it was no secret that these quantities were coming into the laboratory. (Trial Tr. AM Session 55-56, Mar. 1, 2010.) She said the coca would arrive at the laboratory in "loose form" and then would be processed into powder cocaine bricks that were dried, packaged, wrapped in plastic and transported out of the laboratory. (Trial Tr. AM Session 57, Mar. 1, 2010.) She also testified that Mr. Casicura took her to a storage area away from the laboratory where processed cocaine was stored and protected by armed guards. (Trial Tr. AM Session 59-60, Mar. 1, 2010.) Maria Santiago said she heard workers discussing the fact that the cocaine from the defendant's laboratory was destined for the United States. (Trial Tr. AM Session 60, Mar. 1, 2010.)

Witness Hernan Santiago was a former member of the FARC's 14th Front while Fabian Ramirez was the head of the front and Anayibe Valderrama, also known as "Sonia," was the Finance Officer. (Trial Tr. PM Session 48-49, Mar. 2, 2010.) Hernan Santiago testified that he piloted a speed boat that transported money Sonia Valderrama provided to buy cocaine base from peasants and then he transported the purchased cocaine base to a central location in Penas Coloradas. (Trial Tr. PM Session 51, 53, 55, Mar. 2, 2010; Trial Tr. AM Session 17, Mar. 3, 2010.) He stated that the FARC delegated three people to go to each town to purchase coca from the peasants and he was one of the three people. (Trial Tr. AM Session 17, Mar. 3, 2010.) He testified that an average town would produce 200-300 kilograms of cocaine base for each purchase. (Trial Tr. AM Session 19, Mar. 3, 2010.) All

the purchased cocaine base would be brought to Penas Coloradas where it would be piled up and weighed at night to avoid detection. (Trial Tr. AM Session 19, Mar. 3, 2010.) He explained that he typically traveled with two other men to a buying location and two or three FARC guerillas would provide security for the money, which would be packaged in amounts of 10, 20 or 50 million Colombian pesos. (Trial Tr. PM Session 51-53, Mar. 2, 2010.) The amount of money depended on the amount of cocaine base that would be purchased, which averaged about 250-300 kilograms per week. (Trial Tr. PM Session 54, Mar. 2, 2010.)

Hernan Santiago testified that the FARC set the price for cocaine base and the farmers could not negotiate or they would be punished, nor could the farmers sell to anyone other than the FARC. (Trial Tr. PM Session 54, Mar. 2, 2010.) The FARC had checking stations on the margins of the river to ensure that farmers did not sell cocaine base to anyone other than the FARC. (Trial Tr. PM Session 54, Mar. 2, 2010.) When cocaine base was purchased from the farmers the FARC buyers would place a paper in the sacks that identified the farmer's family name and location to deter the farmers from adding things to the sacks to make them weigh more. (Trial Tr. PM Session 55, Mar. 2, 2010.) The FARC buyers also would test each sack of cocaine base to determine whether it contained any additives, weigh it again and then repackage it. (Trial Tr. PM Session 55, Mar. 2, 2010; Trial Tr. AM Session 18, Mar. 3, 2010.)

Hernan Santiago identified the defendant and testified that the defendant managed the laboratories where cocaine "crystal"[3] was produced. (Trial Tr. PM Session 56-57, Mar. 2, 2010.) He said that the defendant's laboratory was bought by the FARC guerillas but that the defendant was the "boss" of the laboratory. (Trial Tr. AM Session 37, Mar. 3, 2010.) He

---

[3]     Witness Ferney Tovar Parra, *infra*, testified that cocaine hydrochloride is referred to as "crystal cocaine" in Colombia. (Trial Tr. AM Session 39, Mar. 23, 2010.)

said he visited the laboratory "on occasion" but could not stay because the laboratory was clandestine and boats would reveal its location. (Trial Tr. AM Session 37, Mar. 3, 2010.) He described the equipment he saw at the defendant's laboratory and the general layout of the structures. (Trial Tr. AM Session 39, Mar. 3, 2010.)

Hernan Santiago testified that he first met the defendant in 1998 when he and Sonia Valderrama delivered cocaine base to Penas Coloradas and the defendant arrived by speed boat with two or three uniformed FARC guerillas to review the notebook Sonia had that documented the amount of delivered cocaine base. (Trial Tr. AM Session 16, Mar. 3, 2010.) He said the defendant was dressed in civilian clothing but carried a handgun and a short-wave radio. (Trial Tr. AM Session 20, Mar. 3, 2010.) According to Hernan Santiago, the defendant "came to the table where [the cocaine base] had been weighed, and the accounts been done, and he reviewed Sonia's notebook regarding how much had come from each town." (Trial Tr. AM Session 20, Mar. 3, 2010.) He testified that the defendant "[t]hen . . . took [the cocaine base] to a [cargo] boat where it was loaded pre-dawn to be taken towards the Sunsiya [river]." (Trial Tr. AM Session 20, Mar. 3, 2010.) Hernan Santiago said that he helped load the cocaine base onto the cargo boat. (Trial Tr. AM Session 21, Mar. 3, 2010.) He also said that, if the cargo boat failed to arrive to transport the cocaine base, the cocaine base would be moved further into the jungle and guarded until the defendant communicated with Sonia Valderrama to order that the cocaine base be transported to the defendant's laboratory. (Trial Tr. AM Session 39-40, Mar. 3, 2010.)

Hernan Santiago further testified that when the cocaine base was brought to Penas Coloradas, Sonia Valderrama, her brother and a third person would weigh and test the cocaine base and the defendant would comment about the testing process by saying that they "had to be very careful to make sure [the cocaine base] was absolutely dry and to be very careful with

--12--

the cutting agents." (Trial Tr. AM Session 22, Mar. 3, 2010.) Each time Hernan Santiago saw the defendant "he would go to review the notebooks with Sonia about the amounts," although he also noted that the defendant and Sonia sometimes communicated by radio. (Trial Tr. AM Session 23, Mar. 3, 2010.) Hernan Santiago said he saw the defendant weekly over a three to four-year time period when "[t]here would be weekly purchases made and deliveries of the cocaine" and the same weighing, testing and repackaging of the cocaine base would take place. (Trial Tr. AM Session 24-25, Mar. 3, 2010.) He stated that "[m]ost of the time [the defendant] was there at pre-dawn to review the notebook" and "[a]lways at dawn when the boat was to be loaded." (Trial Tr. AM Session 25, Mar. 3, 2010.) He also stated that, at one point, the defendant "was telling Sonia that Fabian [Ramirez] was demanding that the testing be done more thoroughly, because it was lowering – decreasing the cocaine in the lab. So they had to test much more carefully to verify for water and impurities." (Trial Tr. AM Session 32, Mar. 3, 2010.)

Hernan Santiago also explained that sometimes there were problems purchasing cocaine base because the FARC's money would be in United States dollars that had not been converted to Colombian pesos, which was the currency needed for cocaine base purchases. (Trial Tr. AM Session 26, 32, Mar. 3, 2010.) He said that when there were only United States dollars available they would give the peasants IOUs for cocaine base. (Trial Tr. AM Session 35, Mar. 3, 2010.) He said he saw United States dollars packed in boxes and there was "a lot of talk" at night about where the dollars came from and "[t]hat the Americans were angry at the organization because we were bringing over dollars for drugs." (Trial Tr. AM Session 33, Mar. 3, 2010.) He went on to state that "[i]t was even said that the Americans were pursuing the coke because it could not be cultivated or harvested in the United States" and "[o]nce it was said that the gringos were always mad because of the drugs, because we brought the drugs

--13--

up there, and because they had – and most of them have plastic noses from sniffing it so much." (Trial Tr. AM Session 34, Mar. 3, 2010.)   Hernan Santiago said that the importation of cocaine to the United States was a common topic of conversation at the meetings to weigh and test the cocaine base and that "[w]e were once talking about that subject when [the defendant] arrived in the morning." (Trial Tr. AM Session 34, Mar. 3, 2010.)

Witness Alexis Perez testified that he was a FARC guerilla who worked for the 43rd Front, the general staff of the Eastern Bloc, as a guard for Mono JoJoy,[4] and then he was assigned to the Juan Jose Rondon Mobile Column. (Trial Tr. PM Session 6, Mar. 10, 2010.) Perez testified that while he was part of the Mobile Column he traveled to the 14th Front in 2002 with Ricuate, a commander of the 14th Front, and Urias, the commander the Mobile Column. (Trial Tr. PM Session 6, Mar. 10, 2010.)   Perez identified the defendant and said he met the defendant while he was traveling in the 14th Front with Ricaute and Urias. (Trial Tr. PM Session 6, 7, 8, Mar. 10, 2010.)   Perez said that they arrived at a house in Guayabal where the defendant introduced himself and greeted them. (Trial Tr. PM Session 7, Mar. 10, 2010.) Perez said he saw cocaine in the house where "they were conducting activities that began with the testing and working with the coca." (Trial Tr. PM Session 7, Mar. 10, 2010.) Perez testified that, at that time, the defendant "was taking down the accounts of what seven people that were working there were telling him; that is, he kept a record of what these people were telling him that the drug or the coke weighed" and "[t]hey were doing the process of testing the drug and weighing the drug." (Trial Tr. PM Session 9, Mar. 10, 2010.)   He explained that:

---

[4]     Mono JoJoy was a commander of the FARC's Eastern Front. (Trial Tr. PM Session 44, Feb. 25, 2010.)

--14--

They were conducting this activity which was weighing the drugs, which is the control they exercise in the area over the purchase of it, from the peasants. This is done so that farmers don't get to add anything to it, something we call additives in Colombia.

So the drugs are accompanied with the name of the farmer that sold it to the guerillas. So this is what they were more or less doing at this location and – because observed it for about 30 minutes [sic].

(Trial Tr. PM Session 8, Mar. 10, 2010.) Perez further stated that he could see the drugs and there were about 2,000 kilograms of cocaine base in the house that day. (Trial Tr. PM Session 9, Mar. 10, 2010.) The following day, the cocaine base was loaded onto a boat in the defendant's presence and then the boat headed down the river. (Trial Tr. PM Session 10, Mar. 10, 2010.)

Perez testified that the following week he accompanied Ricaute to a cocaine laboratory where the defendant greeted them again. (Trial Tr. PM Session 10, Mar. 10, 2010.) Perez described the laboratory as one that produced "crystal" cocaine, which he described as a "much more sophisticated" laboratory that had an electricity generator, "many ovens," and "[t]hat day, there were many people working there." (Trial Tr. PM Session 11, Mar. 10, 2010.) He also stated that the laboratory "had a smell of ammonia and sulfur, and you know by those smells that it is a coke lab." (Trial Tr. PM Session 13, Mar. 10, 2010.) When asked what the defendant was doing, Perez responded that "[i]n a moment there, three speedboats arrived, loaded with drugs. And he gave them instructions. He gave instructions to the pilots that they could leave, telling them that they were waiting for them, that the landing strip was waiting." (Trial Tr. PM Session 11, 54, Mar. 10, 2010.) Perez said he knew crystal cocaine was on the boats because he recognized the packaging and "[w]hat that lab does is coca, so it was loaded with coca." (Trial Tr. PM Session 12, Mar. 10, 2010.) He testified that he was certain the boats contained cocaine "because ever since I was small, I was – I would harvest

coca leaves. So I know how the coca is processed. I know the smell. I know how it is packaged. So it is very easy to tell that is was coke." (Trial Tr. PM Session 53, Mar. 10, 2010.) He also said that "[t]here were about 700 kilos in each of the speedboats, because that is about the weight that these kind of boats can carry, because I was also a pilot for these kind of boats." (Trial Tr. PM Session 12, Mar. 10, 2010.)

Perez said that "in most of the fronts where I was, coca is grown" and "in the fronts, there was always coke activity." (Trial Tr. PM Session 15, Mar. 10, 2010.) He also said that it was "something normal" to hear members of the FARC commenting "that the coke was coming to the United States because it said that it is the country that most consumes it." (Trial Tr. PM Session 21, Mar. 10, 2010.) Perez testified that Mono JoJoy said during a meeting at a training school "that the cocaine was all coming to the United States." (Trial Tr. PM Session 23, Mar. 10, 2010.) Perez explained that this statement was made while the guerillas "were receiving instructions, military instructions and political economics." (Trial Tr. PM Session 23, Mar. 10, 2010.) According to Perez, Mono JoyJoy said "[t]hat the drug was going to the United States to make them go crazy, because that is the policy, that is the image that is portrayed in the FARC." (Trial Tr. PM Session 24, Mar. 10, 2010.)

Witness Ferney Tovar Parra testified that he was never a member of the FARC but he knew the defendant's brother, Fabian Ramirez, since 1981 when Ramirez joined the FARC. (Trial Tr. AM Session 30, Mar. 23, 2010.) Tovar said that he performed errands for Ramirez in 1996 and, as a result of working for Ramirez, Tovar established a friendship with Ramirez's brother, the defendant. (Trial Tr. AM Session 30, Mar. 23, 2010.) Tovar explained that his role working for Ramirez changed after 1996 because "Ramirez began to set in motion a plan or a project where he would concentrate all of the drug trafficking business in his own hands." (Trial Tr. AM Session 31, Mar. 23, 2010.) Tovar testified that Ramirez

told him that "the profits derived from all of this business from the drug trafficking was being pocketed by the drug traffickers, and these were moments when the FARC found itself in a critical situation with many needs, and that is why he initiated it." (Trial Tr. AM Session 31, Mar. 23, 2010.) Ramirez told Tovar that the details of the plan "consisted of one, to concentrate the production of the cocaine in his own hands; and two, then to sell for cocaine – the cocaine base after getting production of the upper, middle and lower Caguan, the production of the peasantry in those areas." Tovar aid that "Fabian Ramirez decided that he would make Penas Coloradas on the Caguan River the epicenter of all of his activities." (Trial Tr. AM Session 29, Mar. 23, 2010.)

Tovar said that the first phase of Ramirez's plan involved establishing a monopoly over all the production of cocaine base from the peasants and farmers in the area. (Trial Tr. AM Session 32, 33, Mar. 23, 2010.)  To accomplish this Ramirez designated the FARC's militia to collect cocaine base from the peasants and he demanded the highest quality cocaine base that was free of humidity and "dirt." (Trial Tr. AM Session 32, Mar. 23, 2010.) As a result, Tovar testified, the purity of the cocaine base was so improved that it "led to a rise in the price of the cocaine base." (Trial Tr. AM Session 31, Mar. 23, 2010.) According to Tovar, Ramirez "was so successful in obtaining this that the drug traffickers themselves were known to say that the cocaine base was . . . [t]he best in the Caguan – the cocaine base was the best in Colombia." (Trial Tr. AM Session 32, Mar. 23, 2010.)

Tovar said that "the second phase was the marketing phase. And based on the fact that the quality of the cocaine base had been improved, Caguan River was overrun by buyers of cocaine." (Trial Tr. AM Session 34, Mar. 23, 2010.) Tovar explained that, at that time, there were two laboratories in the area that processed cocaine hydrochloride so Ramirez "put

--17--

an end to their activities and set up his own laboratory." (Trial Tr. AM Session 34, Mar. 23, 2010.) When he was asked who Ramirez put in charge of the laboratory, Tovar responded:

> Well, for this great responsibility – this great responsibility he assigned to his brother, Erminso Cuevas Cabrera, and he made him – he named him the general administrator of the laboratory, and he set up the laboratory in Monte Adentro, which is 15 to 20 minutes away from Penas Coloradas on the Caguan River.

(Trial Tr. AM Session 34, Mar. 23, 2010.) Tovar said the defendant was "the brother most loved by Fabian Ramirez" and that Ramirez gave his child to the defendant to raise. (Trial Tr. AM Session 35, 36, Mar. 23, 2010.)

In 1999, Ramirez met with Tovar, the commander of the FARC's Western Bloc, and another drug trafficker and told them that the FARC's Secretariat had named Ramirez to be a leader to provide training to the Finance Officers in the different Blocs to implement the same policies Ramirez established regarding cocaine trafficking in the Caguan region. (Trial Tr. AM Session 58, Mar. 23, 2010.) Ramirez also told them that "he had been promoted to become a member of the Central High Command of the FARC . . . and he told us [as] a point of pride that he had been promoted within the FARC hierarchy." (Trial Tr. AM Session 58, Mar. 23, 2010.) Ramirez explained that "[t]he guidance he was providing was the same for all of the leaders of the different blocks [sic]. The idea was for them to implement this strategy whereby the FARC would take this drug trafficking business into their own hands, not allowing the drug traffickers to come into FARC-controlled areas any more and impose their own sets of command." (Trial Tr. AM Session 59, Mar. 23, 2010.)

Tovar testified that he visited the defendant's laboratory twice and he described the location and layout of the houses where the defendant, Sonia Valderrama, and Fabian Ramirez stayed. (Trial Tr. AM Session 36-37, Mar. 23, 2010.) The first time he visited the laboratory he did so at the behest of Ramirez, who called Tovar and requested that he bring a

--18--

roll of black plastic tarp and then told him to deliver the tarp to the defendant at the laboratory. (Trial Tr. AM Session 37, Mar. 23, 2010.) When Tovar delivered the tarp he observed "[p]eople working, processing coca" and he said that the defendant was there. (Trial Tr. AM Session 37, Mar. 23, 2010.)

The second time Tovar visited the laboratory was late in 1998 when he was acting "as a marketing agent for this new drug trafficking project" initiated by Ramirez. (Trial Tr. AM Session 38, 39, 43, Mar. 23, 2010.). Tovar said his "role in this new drug trafficking policy of the FARC was to sell this policy to the drug traffickers." (Trial Tr. PM Session 47, Mar. 23, 2010.) At that time, Tovar introduced Ramirez to Jota, who was a Brazilian drug trafficker interested in obtaining 2,240 kilograms of cocaine hydrochloride for export to Brazil. (Trial Tr. AM Session 39, Mar. 23, 2010.) Ramirez agreed to provide the cocaine hydrochloride from the defendant's laboratory. Jota later sent a representative who, along with Tovar, went to the laboratory to oversee the first "load" of 320 kilograms of cocaine hydrochloride. (Trial Tr. AM Session 41, Mar. 23, 2010.) While they were at the laboratory they ate breakfast with the defendant. (Trial Tr. AM Session 41, Mar. 23, 2010.) Tovar said that the defendant's laboratory produced all 2,240 kilograms of cocaine hydrochloride, which Tovar transported by boat to an air strip for shipment to Brazil. (Trial Tr. AM Session 42, Mar. 23, 2010.)

Tovar also represented Ramirez in a deal with a Norte el Valle cartel trafficker who "needed 4000 to 5000 kilograms of cocaine to send per month to the United States, crystal." (Trial Tr. AM Session 44, Mar. 23, 2010.) Tovar told the Norte el Valle cartel trafficker "not to worry, that per week 3000 to 4000 kilos of cocaine base was produced each week, and I told him that there was a laboratory that existed that belonged to Mr. Fabian [Ramirez], and that it was responsibly managed by his brother, Mincho, and I also told him there was an

airstrip." (Trial Tr. AM Session 44, Mar. 23, 2010.) When asked whether any of the FARC leaders above Ramirez were aware of the deal to move 4,000 to 5,000 kilograms of cocaine per month to the United States, Tovar responded:

> [D]uring that time period, Mr. Fabian Ramirez was the second in command of the southern block [sic] of the FARC. The main commander was known as Joaquin Gomez. And Mr. Ramirez would tell me, for this kind of business, which was such a large scale, everything had to be consulted with the commander who was Joaquin Gomez.

(Trial Tr. AM Session 46, Mar. 23, 2010.) Although "[t]he operation was frustrated," Tovar testified that the defendant's laboratory had the capacity to produce 4,000 to 5,000 kilograms of cocaine per month. (Trial Tr. AM Session 49, Mar. 23, 2010.)

In 2000, Tovar assisted Ramirez to sell 560 kilograms of cocaine that were left over from a deal that involved sending 1,000 kilograms of high-purity cocaine to the United States. (Trial Tr. AM Session 60-61, Mar. 23, 2010.) The deal experienced setbacks that resulted in only 440 kilograms actually being sent to the United States. (Trial Tr. AM Session 61, Mar. 23, 2010.) Tovar helped sell the 560 kilogram overage to another drug trafficker. (Trial Tr. AM Session 62, Mar. 23, 2010.)

During part of his testimony Tovar explained how cocaine was delivered to him from the defendant's laboratory. Tovar said that Sonia Valderrama was the Finance Officer of the 14th Front during this time period and "Erminso [the defendant] would send the drugs to Sonja [sic], who then in turn would store them, and then she would send them to Boris or Jimmy, men who were her trusted – who were trusted by Sonja [sic], who would then deliver them to me." (Trial Tr. AM Session 53, Mar. 23, 2010.) Tovar stated that "the drugs left [the defendant's laboratory] immediately, because one of the security measures was that they be moved immediately in case there should be a military operation carried out by the

Colombian military authorities, and thus they would avoid – they would avoid having the drugs seized at the laboratory." (Trial Tr. AM Session 52, Mar. 23, 2010.)

Tovar also testified that he handled large amounts of United States currency for Ramirez, such as in 1999 when he delivered $330,000 to Sonia Valderrama for Ramirez. (Trial Tr. AM Session 55, Mar. 23, 2010.) He also said that, in 2000, he delivered $550,000 to Ramirez that were proceeds from a transaction made at Sonia Valderrama's house that resulted in 1,000 kilograms of cocaine – "cooked in Mr. Erminso's [the defendant's] kitchen" – being exported to Suriname. (Trial Tr. AM Session 56, 57, Mar. 23, 2010.) Tovar said he handed the money over to Ramirez in front of the defendant's laboratory and that the defendant was there "and he said that is good business. Show me the money." (Trial Tr. AM Session 56, Mar. 23, 2010.) The defendant also was present when they counted the money. (Trial Tr. AM Session 56, Mar. 23, 2010.)

In 2004, when Ramirez returned to the Caguan region after a two-year absence, he met with Tovar and the defendant to discuss retaking control of drug trafficking in the region, which had been diminished by the Colombian government's military presence. (Trial Tr. AM Session 62-63, Mar. 23, 2010.) Tovar said that during the meeting Ramirez:

> [A]sked us, Mr. Mincho and myself, who were completely trusted by him to help reactivate drug trafficking along the Caguan River, and he delegated us roles. Mr. Mincho was given the role of going to Bogota, which was not a problem for him, to make contact with drug traffickers, to either ask for a loan of money, or for them to come down to meet him in person, as a way of reactivating the drug trafficking again.

(Trial Tr. AM Session 63, Mar. 23, 2010.) Tovar testified that the defendant traveled to meet with the drug traffickers in a place near Bogota and Tovar talked to the defendant by phone and conveyed to Ramirez "how the management of the situation was going between Mr. Mincho and the drug traffickers." (Trial Tr. AM Session 64, Mar. 23, 2010.) Recordings of

--21--

conversations between the defendant and Tovar, during which they discussed the defendant's efforts to meet with drug traffickers and the traffickers' reluctance to agree to a loan, were admitted into evidence during the trial. (Trial Tr. AM Session 65-73, Mar. 23, 2010; Trial Tr. PM Session 3-10, Mar. 23, 2010.) The defendant was arrested several weeks after the recorded conversations took place. (Trial Tr. PM Session 10, Mar. 23, 2010.)

Tovar concluded his testimony by stating that the defendant "had maximum responsibility" for manufacturing cocaine for the 14th Front and he was "[t]he only person with that level of responsibility." (Trial Tr. PM Session 29, Mar. 23, 2010.)

The trial took nearly six weeks and ended with the jury returning a guilty verdict against both the defendant and Martinez Vega on April 13, 2010. The defendant now seeks to have the Court set aside the jury verdict against him and enter a judgment of acquittal or, alternatively, grant him a new trial or dismiss the indictment.

## II. MOTION FOR A JUDGMENT OF ACQUITTAL

Rule 29 of the Federal Rules of Criminal Procedure authorizes a court to set aside a guilty verdict and enter a judgment of acquittal in response to a defendant's timely motion. Fed. R. Crim. P. 29(c)(1)-(2). When considering a motion for acquittal, the Court determines whether "viewing the evidence in the light most favorable to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury *must necessarily* entertain a reasonable doubt on the evidence presented." *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983) (Tamm, J.) (emphasis in original). "If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make." *Curley v. United States*, 160 F.2d 229, 237 (D.C. Cir. 1947) (Prettyman, J.).

--22--

### A. Variance

The defendant first claims that the evidence proved at trial impermissibly varied from the allegations in the indictment by establishing multiple conspiracies rather than a single conspiracy. (Def.'s Mot. for Acquittal 5-8.) According to the defendant, the trial evidence proved the following multiple conspiracies: (1) "[a]n alleged conspiracy to manufacture and distribute cocaine involving numerous drug traffickers;" (2) "[a]n alleged conspiracy to manufacture and distribute cocaine, intending or knowing that such cocaine would be imported into the United States, involving Fabian Ramirez, Ferney Tovar Parra, and . . . Cesar Augusto Perez Parra;" (3) "[a]n alleged conspiracy to distribute cocaine, intending or knowing that such cocaine would be imported into the United States, Suriname, Africa, Mexico;" (4) "[a]n alleged conspiracy to manufacture and distribute cocaine, involving Fabian Ramirez and right-wing paramilitary organizations in Colombia;" and (5) "[a]n alleged conspiracy to overthrow the government of the Republic of Colombia involving the FARC." (Def.'s Mot. for Acquittal 7-8.) The defendant asserts that he was prejudiced by the variance between the indictment's single charged conspiracy and the multiple conspiracies he claims were proven at trial because he "[e]ssentially . . . was tried for felonies not contained within his indictment, in violation of the Fifth Amendment" and "his Sixth Amendment right to be informed of the nature of the accusations against him was also violated." (*Id.* at 8.) The defendant also complains that the variance prevented him from adequately preparing his defense and resulted in evidence against his co-defendant, Juan Jose Martinez Vega, "spilling over" and being transferred to the defendant. (*Id.*)

A judgment of acquittal is warranted based on a variance between the allegations in the indictment and the proof at trial if the defendant shows that (1) the trial evidence established

facts that varied materially from the indictment's allegations and (2) the variance caused substantial prejudice. *United States v. Celis*, 608 F.3d 818, 845 (D.C. Cir. June 18, 2010) (per curiam). "In a conspiracy prosecution, for example, the appellant may prove (1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988) (per curiam) (internal citations omitted). When considering whether the evidence established the existence of multiple conspiracies versus a single conspiracy, "we must view 'the evidence in the light most favorable' to the government, asking 'whether *any* rational trier of fact could have found the essential elements of [conspiracy] beyond a reasonable doubt.'" *United States v. Carson*, 455 F.3d 336, 375 (D.C. Cir. 2006) (per curiam) (quoting *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996) (Tatel, J.) (emphasis and alteration in original)). It is well established, however, that "[t]he verdict must be upheld if the evidence adequately supports a finding that a single conspiracy existed." *Id.* Ultimately, "[t]he true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82 (1935) (Sutherland, J.).

In narcotics cases like this one, "[a] single conspiracy may be established when each conspirator knows of the existence of the larger conspiracy and the necessity for other participants, even if he is ignorant of their precise identities." *Id.* In such cases, a "single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective." *Id.* Furthermore, "a single conspiracy can 'pursue multiple schemes with different modi operandi without dividing into multiple conspiracies, as

--24--

long as there is a single objective.'" *United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009) (Griffith, J.) (quoting *United States v. Hemphill*, 514 F.3d 1350, 1364 (D.C. Cir. 2008) (Brown, J.)). "Whether a course of conduct should be classified as a single conspiracy or divided into multiple conspiracies depends on whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan," *id.*, although overlap among alleged participants is "less significant," *Graham*, 83 F.3d at 1471.

Viewing the evidence in the light most favorable to the government, the Court finds that it adequately supports a finding by a rational trier of fact that a single conspiracy existed to import five kilograms and more of cocaine into the United States and manufacture and distribute five kilograms and more of cocaine knowing and intending that the cocaine would be unlawfully imported into the United States. As summarized above, the trial evidence showed that, beginning in the late 1990s and continuing through the early to mid 2000s, the FARC occupied large regions of Colombia and took over all aspects of cocaine trafficking in those regions by monopolizing the purchase of cocaine base from peasants and farmers, establishing policies and procedures to increase the purity of the cocaine base, processing the cocaine base into cocaine hydrochloride at its own laboratories, and then establishing a distribution network through narcotics traffickers to sell the cocaine in the United States for profit. Notably, witnesses testified that it was commonly known and discussed among the conspiracy participants at all levels, from the FARC's leadership and commanders to the workers in the cocaine laboratories, that cocaine the FARC was manufacturing and distributing was destined for the United States.

In the 14th Front, which included the region around the Caguan River, Fabian Ramirez furthered the FARC's efforts to dominate the cocaine trade and increase its revenues by

--25--

shutting down private cocaine hydrochloride laboratories and setting up his own laboratory that was operated by his brother, the defendant. Witnesses offered testimony that confirmed and corroborated that: the defendant operated the large cocaine laboratory where cocaine base was processed into cocaine hydrochloride; was present when thousands of kilograms of cocaine base were being weighed and tested at Penas Coloradas; would review and make an accounting of the cocaine base when the 14th Front's Finance Officer was weighing, testing and repackaging it for shipment to the defendant's laboratory; directed the Finance Officer that Ramirez wanted the testing to be done more thoroughly; supervised loading the cocaine base onto boats for transport to his laboratory; instructed the pilots of speed boats about where to transport the cocaine for a transaction; produced thousands of kilograms of cocaine hydrochloride weekly for deals arranged between Ramirez and narcotics traffickers, including deals that involved shipping cocaine to the United States; and arranged meetings with narcotics traffickers at Ramirez's behest in an effort to revitalize the cocaine trade in the Caguan River region at a time when activity had slowed because of the Colombian military's activities there.

Significantly, the trial evidence established a virtually seamless and dependent relationship between the defendant and at least two of the FARC's leadership – Fabian Ramirez and Sonia Valderrama – with respect to the conspiracy's goal of violating United States narcotics laws by importing cocaine into the United States and manufacturing and distributing cocaine knowing and intending that it would be imported into the United States. In the final analysis, the trial evidence revealed that it was of no real consequence that the defendant was not an official member of the FARC because he nevertheless was quite integral, integrated and involved in the FARC's efforts to monopolize and profit from the cocaine trade in the regions it controlled, such as the 14th Front. The defendant and the other conspiracy participants shared a common purpose to further the conspiracy's goals and were dependent on

--26--

each other to accomplish them. The FARC could not profit from the cocaine trade without monopolizing the market for cocaine base in the geographic areas it occupied, which was an effort that Sonia Valderrama supervised for the 14th Front and the defendant participated in by reviewing and accounting the weighing and testing of the cocaine base. The FARC could not realize the profitability of the cocaine base in the 14th Front without the defendant's laboratory processing it into cocaine hydrochloride and the defendant working with his brother, Fabian Ramirez, and narcotics traffickers to market it. It is well established in this jurisdiction that:

> [W]hile proof of conspiracy requires proof of an agreement, the jury may infer this agreement from the defendant's knowing participation in a distribution network organized along division of labor principles-in which his own role necessarily depends on the cooperation of other parties to that network: "The existence of such a vertically integrated, loose-knit combination may raise the inference that each conspirator has agreed with the others (some whose specific identity may be unknown) to further a common unlawful objective, e.g., the distribution of narcotics."

*United States v. Childress*, 58 F.3d 693, 710 (D.C. Cir. 1995) (per curiam) (quoting *Tarantino*, 846 F.2d at 1393)). *See also United States v. Agueci*, 310 F.2d 817, 827 (2d Cir. 1962) (Kaufman, J.) ("An individual associating himself with a 'chain' conspiracy knows that it has a 'scope' and that for its success it requires an organization wider than may be disclosed by his personal participation.") In this case, all the participants were involved together in carrying out at least some parts of the common unlawful objectives of the conspiracy as demonstrated by the intertwining and overarching activities of the FARC , Fabian Ramirez, Sonia Valderrama, the defendant and the narcotics traffickers who distributed and transported the cocaine for the FARC. Accordingly, reviewing the trial evidence in the light most favorable to the government, it was more than adequate to establish a single conspiracy to violate United States narcotics laws by importing cocaine into the United States and manufacturing and distributing cocaine knowing and intending that it would be imported into

the United States, and to establish that the defendant was part of that single conspiracy as an associate of the FARC who manufactured the very cocaine hydrochloride that made the success of the conspiracy possible.

Furthermore, the defendant's argument that he was tried for felonies not contained in the indictment lacks merit, as does his claim that he was prejudiced by the indictment's failure to inform him of the nature of the accusations against him, which he contends prevented him from preparing an adequate defense. (Def.'s Mot. for Acquittal 8.) In actuality, when the indictment is compared to the trial evidence, *see* Background, *supra*, there is no overlooking the fact that the indictment was practically a roadmap of the very evidence admitted at trial. Thus, the defendant cannot credibly claim surprise and the defendant's substantial rights were not affected by a variance.

**B.    Prejudicial Joinder**

In a separate but related argument, the defendant complains that evidence of multiple conspiracies at trial and his joinder with his co-defendant caused him "irreparable prejudice." (Def.'s Mot. for Acquittal 10.) The defendant takes issue with the nature of the evidence about the FARC that was admitted against his co-defendant, *id.* at 9, and suggests that "it would be nearly impossible to overestimate the 'spillover' effect of the FARC testimony upon Mr. Cuevas," *id.* at 10.

The Court looks at three factors to determine how difficult it was for a jury to separate allegations against multiple defendants: (1) the number of co-defendants, (2) whether the government presented tape recordings involving the individual defendants, and (3) whether the court issued clarifying jury instructions. *Celis*, 608 F.3d at 845. After considering these

factors, this Court is not persuaded that the defendant was irreparably harmed by the alleged spillover of evidence at his trial.

Even setting aside the Court's determination that the trial evidence adequately proved a single conspiracy, the fact of the matter is that there were only two defendants in this trial and the presentation of evidence, with the exception of expert testimony about the cocaine routes from Colombia and the general structure of the FARC, was quite compartmentalized with respect to each defendant, particularly since each defendant was involved with a different FARC Front in separate geographical regions of Colombia. As a consequence, there really was no mistaking which defendant was implicated by the evidence and, as a corollary, there was little risk of spillover. As the D.C. Circuit has observed, "[t]he risk of 'spillover prejudice,' which may occur when a jury imputes evidence from one conspiracy to a defendant involved in another conspiracy, is less likely the fewer the defendants." *United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C. Cir. 1997) (per curiam).

Furthermore, intercepted communications between the defendant and witness Ferney Tovar Parra were admitted during the trial and those communications involved discussions about illegal activities.[5] (Trial Tr. AM Session 65-73, Mar. 23, 2010.) "When the government presents an audio or video recording of the defendant discussing criminal acts, the risk of prejudicial spillover is minimal because the jury has 'no need to look beyond each defendant's own words in order to convict.'" *Celis*, 608 F.3d at 846 (quoting *United States v. Anderson*, 39 F.3d 331, 348 (D.C. Cir.1994) (per curiam)).

---

[5]     Likewise, the government introduced intercepted audio communications involving co-defendant Martinez Vega discussing criminal acts. (Trial Tr. AM Session 43-54, Mar. 18, 2010; Trial Tr. PM Session 3-19, Mar. 18, 2010.)

The Court also instructed the jury that "[i]n deciding whether . . . Erminso Cuevas Cabrera . . . became a member of that conspiracy, you may consider only the acts and statements of that particular defendant." Final Jury Instructions 33. The Court further instructed the jury that "[y]ou should give separate consideration, and render separate verdicts, with respect to each defendant. Each defendant is entitled to have the issue of his guilt of the crime for which he is on trial determined from his own conduct and from the evidence that applies to him, as if he were being tried alone. The fact that you may find one defendant guilty or not guilty should not influence your verdict as to any other defendant." *Id.* at 50. These instructions served to clarify for the jurors that they may consider only the evidence admitted against the defendant, and not evidence admitted against his co-defendant, when deliberating about his guilt. "The jury is presumed to follow the instructions." *United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010) (Rogers, J.).

Given that there were only two defendants, audio recordings were admitted against each defendant, and jury instructions made clear that the jury must compartmentalize the evidence against the two defendants, the Court finds that any alleged variance from the indictment was not prejudicial to the defendant and does not warrant a judgment of acquittal. *Celis*, 608 F.3d at 846.

## C.    Sufficiency of the Evidence

The defendant disputes the sufficiency of the trial evidence to establish that he knew that the cocaine involved in the conspiracy would be unlawfully imported into the United States, in which case he asserts that he is entitled to a judgment of acquittal. (Def.'s Mot. for Acquittal 10-11.) Presented with a motion for a judgment of acquittal on the ground that the evidence is insufficient, the Court must consider "whether, viewing the evidence in the light most favorable

to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury must necessarily entertain a reasonable doubt on the evidence presented." *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983) (Tamm, J.). "In reviewing the evidence, we keep in mind that proof of [the defendant's] intent or knowledge may take the form of circumstantial as well as direct evidence." *United States v. Martinez*, 476 F.3d 961, 968 (D.C. Cir. 2007) (Kavanaugh, J.) (internal quotation marks omitted). "If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make." *United States v. Curley*, 160 F.2d 229, 237 (D.C. Cir. 1947) (Prettyman, J.).

The trial evidence showed that the FARC conducted a large-scale cocaine-trafficking operation that was organized geographically and carried out by the various Fronts to fund the FARC's organization and leadership. In the 14th Front, the defendant reviewed and documented the accounting of thousands of kilograms of cocaine base that FARC guerillas delivered to Penas Coloradas, where it was tested and weighed by the 14th Front's Finance Officer, Sonia Valderrama, before being loaded on boats and transported to a laboratory the defendant operated for Front leader Fabian Ramirez, who was his brother. The defendant was the "boss" of Fabian Ramirez's laboratory, supervising around 80 workers and manufacturing thousands of kilograms of cocaine base into cocaine hydrochloride. The trial evidence established that the cocaine's ultimate destination to the United States was a common topic of conversation when Sonia Valderrama and others were weighing and testing the cocaine at Penas Coloradas, workers at the defendant's laboratory discussed the fact that the cocaine being manufactured there was destined for the United States, and a FARC Bloc commander even talked about the importation of cocaine to the United States as a matter of FARC policy. The defendant was involved in cocaine deals

with narcotics traffickers, including at least one that involved shipping cocaine directly to the United States. In addition, witness testimony revealed that hundreds of thousands of dollars of United States currency was circulating among the conspiracy's participants and that, at times, payment for the cocaine base that the defendant processed was not possible because United States dollars had not been converted to Colombian pesos. Moreover, expert testimony established that the United States was a primary destination for cocaine from Colombia.

All this evidence, which as the court noted is not exhaustive of what was admitted at trial,[6] and the legitimate inferences that can be drawn therefrom, is sufficient to show that, not only was the defendant integrally involved in the FARC's large-scale conspiracy to manufacture cocaine to fund its efforts, but it also can be reasonably and legitimately inferred from this evidence that the defendant manufactured cocaine with the knowledge and intent that it would be imported to the United States. *Martinez*, 476 F.3d at 968. Even if considered a close call, the evidence reasonably permits a verdict of acquittal or a verdict of guilt, in which case the decision was for the jury to make. *Curley*, 160 F.2d at 237.

## III. MOTION FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The Rule does not define 'interests of justice' and the courts have had little success in trying to generalize its meaning." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (Flaum, J.). "Nevertheless, courts have interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *Id.*

---

[6]    *See* n.1, *supra.*

--32--

## A.  Allegation of Improper Prosecutorial Remarks During Closing Arguments

The defendant objects to the prosecutor's comment during closing statements that "the problems of Colombia are a lot closer than they may appear. A lot of the problems right here in Washington, D.C., in New York City, Detroit where I grew up, they can be traced right back to the thousands of pounds of cocaine coming out of Colombia out of this conspiracy." (Trial Tr. AM Session 121, Apr. 7, 2010.)  The defendant argues that "[b]y contending, for the first time in the trial, that cocaine in Detroit, Washington, D.C. and New York originated in Colombia and, inferentially, was produced by Mr. Cuevas, the prosecutor impermissibly placed the jurors in the shoes of the victims of drug abuse." (Def.'s Mot. for Acquittal 15.)  The defendant argues that the prosecutor's "remarks in this regard were a blatant attempt to appeal to the jury's emotions and sympathies for victims of drug abuse generally and in the community in particular." *Id.*

"The touchstone of a prosecutorial misconduct claim is prejudice: the court must consider 'the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly.'" *United States v. Thomas*, 114 F.3d 228, 246 (D.C. Cir. 1997) (Wald, Silberman & Rogers, J.) (quoting *United States v. Young*, 470 U.S. 1, 12 (1985)).  "To determine whether improper remarks by the prosecutor have substantially prejudiced a defendant's trial, the court looks to 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.'" *Id.* (quoting *United States v. Williams-Davis*, 90 F.3d 490, 507 (D.C. Cir. 1996) (Williams, J.)).

It is well established that "[a] prosecutor may not make comments designed to inflame the passions or prejudices of the jury" or "ask jurors to find a defendant guilty as a means of promoting community values, maintaining order, or discouraging future crime." *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000).  Even assuming without deciding that the

prosecutor's remarks violated this tenet, however, the Court is not persuaded that the comment substantially prejudiced the defendant's trial. The comment was isolated, brief and occurred during a lengthy closing argument that covered about six weeks of evidence in a complex narcotics-conspiracy case. The jury heard trial testimony about the percentage and volume of cocaine imported from Colombia into the United States, so a comment suggesting that cocaine entering this country finds its way to major cities was not particularly noteworthy.

"When taken in context of the entire trial and the lengthy closing arguments and rebuttal, the objectionable references did not significantly detract from the proper focus of the argument." *United States v. Oberle*, 136 F.3d 1414, 1422 (10th Cir. 1998) (Ebel, J.). The Court instructed the jury that "[t]he statements and arguments of the lawyers are not evidence," Jury Instructions 10, and "[r]egardless of the prosecutor's statement, the evidence clearly supported the jury's verdict." *United States v. Johnson*, 231 F.3d 43, 49 (D.C. Cir. 2000). The Court therefore concludes that the prosecutor's comment did not affect the jury's ability to judge the evidence fairly and the defendant was not substantially prejudiced.

## B.    Denial of Motions to Sever

The defendant insists that he suffered "substantial and irreparable prejudice" as a result of being tried with co-defendant Martinez Vega so it was improper for the Court to deny the motions for severance he made before and during trial. (Def.'s Mot. for Acquittal 19-21.) By the defendant's account, the "weight of the evidence" offered against his co-defendant "was far greater" than the evidence offered against him, and the "majority of evidence presented by the government" related to the FARC's activities, which was unrelated to him because he is not a FARC member. (*Id.* at 20.)

Although Rule 14(a) of the Federal Rules of Criminal Procedure permits a court to sever the trials of multiple defendants if joinder will prejudice a defendant, "[t]he Supreme Court has instructed district courts to grant severance 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Celis*, 608 F.3d at 844 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). "District courts should grant severance sparingly because of the 'strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors.'" *Id.* (quoting *United States v. Mardian*, 546 F.2d 973, 979 (D.C.Cir.1976)).

It is well established that "[t]he critical determination in evaluating a motion to sever the case of two or more co-defendants is whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." *United States v. Hernandez*, 780 F.2d 113, 119 (D.C. Cir. 1986). Without belaboring the point, and as the Court already indicated, there were only two defendants who went trial in this case and the evidence was very compartmentalized with respect to each of them. Each defendant had a very specific role in the conspiracy (the defendant operated a large laboratory that manufactured cocaine whereas his co-defendant transported and traded cocaine and weapons), each defendant was tied to separate FARC Fronts that were in different geographical regions of Colombia, and each defendant had established and integral relationships with leaders in their respective Fronts who easily could be distinguished by name and events. Finally, "[t]he jury could assess [the defendant's] personal culpability because it heard a significant amount of evidence relating to his own unlawful acts quite apart from anything said about the FARC." *Celis*, 608 F.3d at 845. For

all these reasons no severance was warranted before or during trial, and no new trial is required in the interest of justice.

## C.     Weight of the Evidence

The defendant's last contention is that the weight of the evidence does not support his conviction. (Def.'s Mot. for Acquittal 21-22.) "In considering a new trial motion based on the weight of the evidence the district judge weighs the evidence and evaluates the witnesses' credibility and decides whether a serious miscarriage of justice may have occurred." *United States v. Dale*, 991 F.2d 819, 838 (D.C. Cir. 1993) (per curiam).

After consideration of all the trial evidence, much of which is summarized in this opinion and involved eye-witness accounts of the defendant's criminal activities and conduct in furtherance of the conspiracy, and after evaluating the witnesses' credibility in light of their demeanor at trial, the rationality of their testimony, internal consistencies, and "the manner in which it hangs together with other evidence," *Carbo v. United States*, 314 F.2d 718, 749 (D.C. Cir. 1963), the Court is persuaded that the weight of the evidence favors conviction and no miscarriage of justice occurred. Although many of the witnesses were former FARC guerillas who demobilized and entered a program offered by the Colombian government that provides these individuals with benefits, education and immunity from prosecution for their crimes, their testimony was plausible and convincing and consistent to the extent that they each described the defendant engaging in similar criminal activities under similar circumstances (e.g., accounting for cocaine while Sonia Valderrama tested and weighed it, arriving and departing by speed boat and loading boats with cocaine, and manufacturing thousands of kilograms of cocaine as the "boss" of a large cocaine laboratory), and they consistently testified about seeing him interacting with the same FARC leaders (e.g., Sonia Valderrama and Fabian Ramirez).

Additionally, in Parts II (A) and (C) *supra*, the Court found that there was sufficient evidence to support the defendant's conviction for participating in a single conspiracy to violate United States narcotics laws by importing into the United States five kilograms and more of mixtures and substances containing detectable amounts of cocaine and manufacturing and distributing five kilograms and more of mixtures, compounds and substances containing detectable amounts of cocaine, and coca leaves, intending and knowing that these controlled substances would be unlawfully imported into the United States. Likewise, the Court finds that the weight of this same evidence also favors conviction and no miscarriage of justice occurred.

## CONCLUSION

For the foregoing reasons, the Court will deny Erminso Cuevas Cabrera's Motion For A Judgment Of Acquittal, Or, In The Alternative, Motion For New Trial And Motion To Dismiss [Docket No. 270]. An appropriate order will accompany this Memorandum Opinion.

August 30, 2010

Thomas F. Hogan
United States District Judge